## Case No. 14,233.

### TUFTS v. TUFTS et al.

[3 Woodb. & M. 456.] [1]

Circuit Court, D. Massachusetts.    Oct. Term, 1847.

PLEADING IN EQUITY—PROOF—VARIANCE—LAND CONTRACT—AGAINST PUBLIC POLICY—EXECUTORY AGREEMENT—STATUTE OF FRAUDS.

1. If a bill in chancery describe a contract, which it asks to have enforced, as originating after a sale had been made of certain land, and it appears in evidence to have originated before or at the time of the sale, the case must be considered as if the contract was made as proved, and the merits must be decided as if it was so made, or the variance be deemed fatal.

2. Before the sale of land by an executrix to pay debts under a will, a contract made with the expected purchasers, she being a relative to one of them, to hold the land for her benefit, on her paying the interest quarterly, till she should find it convenient to pay the principal, and then to convey to her, and they purchasing the land at less than its true value at that time, was a contract against public policy, and voidable, but generally not void.

3. If, after some years, the purchasers request her to get some other persons to take the land, and she procures her step-son to do it, who pays in part and secures to them the rest of the money, and agrees to stand in their shoes, and do all they had promised, the invalidity of the contract remains the same as it was originally.

4. This last transaction does not raise a resulting trust in her favor, as she did not advance the consideration, nor claim in the bill that the step-son was to take a deed running to her.

[Cited in Kelley v. Jenness, 50 Me. 461.]

5. Nor is it a mortgage, as no absolute debt became due from her to him, but a mere right existed, on paying the interest quarterly and the principal when she became able, to have a conveyance to herself.

6. The transaction was a special contract merely, either agreed to be performed according to its terms, or imposing an ordinary trust to perform it in consequence of the original purchase of the land on the terms stipulated.

7. If the contract be not set out with exactness, any variances will be allowed to be cured by amendments or easy terms, where the substance of it appears. So will be any mistakes in form in pleading the statute of frauds.

[Cited in Bentley v. Phelps, Case No. 1,332.]

8. A consideration is necessary in an executory agreement or trust, in order to require them to be enforced, and it must be a legal and honest one.

9. Where an agreement or trust is executed, or is evidenced by a writing sealed, a consideration will usually be presumed.

10. As a special contract this one was not mutual, she not being obliged to advance the money and take a deed, and hence it may have been inoperative. Time in this case was probably not a part of the essence of the contract.

11. As a contract or a trust in respect to lands, the statute of frauds was pleaded against it, and must prevail, unless continued possession by the executrix with her step-son, and several acts of

apparent ownership exercised over it by her, and charges made in his books, implying some rights in her, are sufficient to take the case out of that statute.

12. In Massachusetts the writing to obviate the statute as to a contract, need not contain the consideration, and perhaps the rule should be the same there as to the writing to evidence a trust.

13. After the lapse of several years, the executrix not paying all the interest nor tendering the principal, the step-son notified her of his determination not to convey to her, and sold a portion of the land to others, who are co-defendants in this bill, but claiming to have bought without notice of her interests, and as the land had greatly risen in value, the complainant, after making an offer of payment to the extent of the original purchase money and interest, instituted this bill, and it was held that such purchasers, if without notice, were not to be affected, so far as they had made payments to the step-son, but if buying with notice, stood like him, and, for all still due, were liable to her, if he was.

14. It was further held, that, as a contract or trust, this collateral undertaking was an executory, and not an executed one, and the present bill being brought to compel its execution, a defence against this, that there was no consideration, or that the consideration was illegal, is not to avoid an executed contract or trust, but to prevent the enforcement of an executory one.

15. Whether, then, the original sale of the land, under such a collateral agreement or trust, was void or voidable, it has been executed, and it cannot probably be avoided, except by creditors or heirs under special proceedings or pleas for that purpose.

[Cited in Mason v. Crosby, Case No. 9,236.]

16. But this collateral agreement or trust being still executory and not executed, and being without any consideration except one against public policy and illegal, a court of equity without any special pleadings should not enforce it by its extraordinary means of relief, but leave a party, thus situated and claiming, to any remedies which may exist at law.

[Cited in Hunter v. Marlboro, Case No. 6,908; Almy v. Wilbur, Id. 256.]

This was a bill in equity founded on the following allegations. Peter Tufts of Cambridge, Mass., died in 1827, leaving a small farm and house thereon, where a part of his family continue to reside till the present time. He died insolvent, and the plaintiff, his wife, being executrix under his will, sold the estate at auction for the purpose of paying the debts, September 22d, 1828. The purchasers were Cutter and Cummings, for about $3,460. It was alleged in the bill that she made an agreement with the purchasers that she might retain possession of the premises, and have a reconveyance of them on paying the sum for which they had sold and interest thereon. It was averred, also, in one part of the bill, that this agreement was made subsequent to the sale, and at the time the deed was executed, and that relying on it, she proceeded to make valuable and permanent improvements on the premises. That in January, A. D. 1831, Cummings conveyed his share in the estate to R. Perkins, and in January, 1832, Perkins conveyed to Cutter, the occupation and improvements by her still going on under the agreement. That in February, 1834, Cutter becoming embarrassed, and anxious to sell the property, she procured Charles Tufts, her step-son,

[1] [Reported by Charles L. Woodbury, Esq., and George Minot, Esq.]

to take a conveyance on the same terms which had before been agreed with Cutter. That Charles Tufts lived in the house with her, professed to be friendly, and continued to let her occupy and improve under the agreement, and to make sales of gravel and trees on her own account till 1842, the property in the meantime having risen much in value, so as to be then worth $40,000. That he then refused to fulfill the agreement, though she was ready and offered to pay the principal and interest due, and demanded a conveyance from him. That in September, 1844, Charles Tufts sold a portion of the premises to E. Wheeler, the other respondent, who was notified of the agreement before named when he purchased. The complainant prayed further, an account, by the respondent, Charles Tufts, of any rents or income, and a conveyance by him and Wheeler of the premises, setting aside his to Wheeler on her paying the original consideration and interest, as by agreement with Cutter and Cummings at first, and afterwards with Charles Tufts. She also asked an injunction against further conveyances by Charles Tufts or Wheeler while these proceedings were pending.

The answer of Charles Tufts admits several of the matters alleged, but denies that Cutter and Cummings entered into any agreement which made the conveyance to them a trust or mortgage, or that he bought of Cutter under any such agreement with him or the complainant, though he made a verbal promise, in the close of 1831 or the first of 1832, that if she paid him his advances and interest within five years, he would convey to her. He further alleged that such only was the agreement between her and Cutter originally, except that originally it was to be done in ten years. He further denied that she had made any valuable improvements, or remained on the premises, except from kindness, or that she had paid rent or interest, though charged against her, or had ever offered to pay them within the original ten or subsequent five years. He also pleaded the revised statute of frauds to her demands, and annexed many accounts between them to show her indebtedness to him.

The answer of Wheeler expressed his belief in the statements of his co-defendant, and denied any knowledge, when he purchased in September, 1844, that the plaintiff claimed any interest in the premises, except as tenant at will.

There was a supplemental bill charging the respondent Charles Tufts with instituting proceedings at law to oust the plaintiff, pending the present bill, and an answer admitting the allegation, and upon this an injunction had issued against further proceedings there till otherwise permitted by this court. A great mass of evidence was put into the case to prove the agreement on which the plaintiff relied, and to show a trust or mortgage as between the plaintiff and Cutter and Cummings till the conveyance to Charles Tufts and since, as between the plaintiff and him. Much proof

was also offered to rebut these. Such portions of the testimony on both sides as may be pertinent will be stated hereafter in the opinion of the court.

Mr. Rand, for complainant.
Sewall & Fletcher, for respondents.

WOODBURY, Circuit Justice. This case has been argued very elaborately on both sides, and requires a full and detailed examination. The allegations in the bill are claimed to make out a case for the complainant to recover on several distinct grounds. One is on an agreement, and virtually asks for a specific performance of it, as if it was founded on a proper consideration, and was otherwise valid, and as if everything previously required on the part of the plaintiff had been done. Another is on what amounts to a mortgage, and seeks, in substance, to be allowed to redeem it on the payment of all which is equitably due. Another is on a constructive trust, growing out of the agreement, which is considered binding on the respondent, but is alleged never to have been performed by him. Another still is on a resulting trust, which is contended to arise in favor of the complainant, on the supposed fact that she advanced all the consideration for the deed from Cutter to the respondent Charles Tufts, the latter acting merely as her agent. The bill in terms sets up none of these grounds for a recovery, except the agreement first mentioned. But in argument, they all have been urged, and it may be just to sustain the bill if either of them come within the facts duly alleged and duly proved. Either of these grounds, also, if well supported under the objections taken against them, would certainly be sufficient to give jurisdiction to this court on its equity side, and hence might justify a decree in favor of the complainant after amendment, even if the grounds be not now sufficiently described. Before examining, however, each of these positions separately and in detail, it may be observed, that there are two general exceptions which are made, and which apply to most of them. They are, first, that the consideration connected here with any agreement, a mortgage or trust is not a good one, while it should in each be legal, or it cannot have the assistance of a court of chancery to enforce it. And secondly, that none of them are proved in writing, though when an agreement, mortgage or ordinary trust relates to an interest in land, it must, by the express requirement of the statute of frauds, be proved by some "writing signed by the party to be made liable." These two general exceptions I shall examine last, as they apply to several of the grounds relied on for a recovery, and as the separate objections to each ground can be best weighed in the first instance and by themselves.

The claim set up by the plaintiff, that the transaction between her and Charles Tufts

created a resulting trust in her, or amounted to a mortgage of these premises by her to him, which she should now be allowed to redeem, is a very important one for her to make out, if practicable, because such a trust would not be affected probably by the statute of frauds. Resulting trusts are expressly excepted from the operation of such statutes generally, and mortgages, where an absolute deed exists, may be shown in chancery by proving by parol, the relation of debtor and creditor between the parties, or the recognition in other ways that the transaction was a mere security for a loan. See cases in Hunter v. Marlboro' [Case No. 6,908]. and Bentley v. Phelps [Id. 1,332]. It is still more important for her to make out either of these, as the consideration connected with them, if it exists, was one between her and Charles Tufts alone, and not between her and the original purchasers, Cummings and Cutter, and hence probably it would not be tainted by any illegal arrangement with them, if one existed between them and her. Is there, then, as insisted by the plaintiff, proved against the respondent anything which raises as against him a peculiar trust merely by operation of law, such as is termed a resulting trust, and which by statute need not be evidenced in writing? or anything which amounts in equity to a mortgage in which the complainant has all the rights of a mortgagor, and the respondent should perform all the duties of a mortgagee? The test fact as to a resulting trust is this. If the respondent, Charles Tufts, used his own money and credit, there is nothing in or from her to raise a resulting trust to her. 4 Burrows. 2255; 4 East. 577; 2 Atk. 74: 5 Johns. Ch. 1; 2 Paige. Ch. 238; 3 Sugd. Vend. 260. While. on the contrary, if he acted then merely in the capacity of her agent, and used her money and not his to buy the land with, a resulting trust would arise in her favor in law, not supposed to be prohibited by the statute of frauds, and independent of its provisions. See cases in Hunter v. Marlboro' [supra]; 1 Russ. & M. 53; 11 Bligh. 397, 418: Hill. Trustees, 55; Lewin. Trusts. 168; 2 Story, Eq. Jur. §§ 1201–1206. So if she borrowed the money of him, and he took her note for the amount, and then had the deed from Cutter and Perkins made out to him, rather than the plaintiff, wrongfully and contrary to agreement, a resulting trust would arise to her. The independent facts separate from the face of the deed are, in such cases, provable by parol, notwithstanding the statute of frauds, sometimes under an express exception in the statute, and sometimes in order to prevent fraud. Lewin, Trusts, 155; 1 Spence, Eq. Jur. 571; 2 Vent. 390: 1 P. Wms. 322. But it is apparent, on a little scrutiny of this transaction, that neither a resulting trust nor a mortgage were intended to be the case in form. I apprehend that the other facts show. also, that neither of them was intended, in sub-

stance, because the respondent became liable to Cutter and Perkins for the whole consideration, and paid part in money and gave his own mortgage for the rest, and did not charge to her the amount in his books (Hill, Trusts. 92), or charge it in any account rendered to her which is produced and proved, though one of her sons swears it was charged in some account he had at some time seen, yet none such is produced. Nor did he take any note of her for the consideration paid, or any mortgage, though the deed running to himself from Cutter and Perkins would perhaps furnish him with a strong security, if he really had made an absolute loan to his step-mother, and if this course was intended as mere security for it. But against either of these parties having intended such a loan, is the further fact that by the agreement as proved, both originally and with the respondent, she was under no obligation to pay the consideration and take the farm, but merely had liberty or permission to do this, if she pleased, and should ever become able to do it. Consequently she could not then mean to pay for it by an agent and by a loan. Nor is it pretended in the bill, or proved, that the respondent promised to take the deed in her name, and to treat her as at once the debtor for the consideration, and to advance the money and credit as hers, which is the usual mode of raising a resulting trust, and which is raised on such facts only, and then in order to prevent a breach of faith operating injuriously and fraudulently. 1 Spence, Eq. Jur. 451, and Lloyd v. Spillet, 2 Atk. 150; Amb. 150. But there is neither any such breach of faith and breach of contract at that time averred in the bill, nor any such attempted to be shown by evidence. There was. likewise, a paramount reason why she should not make any such agreement, or wish to have any such deed at the time of her arrangement with Charles. She appears to have been embarrassed by debts, and did not like to have any interest she possessed in these premises taken to satisfy her debts. Hence she would not desire to have any deeds executed to herself, or any property so situated that the title would be vested in her by resulting trust or mortgage, and be liable to be seized and sold to the extent of her interest. This in some degree, likewise. reconciles her disclaimers to several persons of her having any interest in these premises, because she had intended to have it so situated, that she might in future obtain an interest, if she afterwards pleased, but not have any in præsenti to be exposed to satisfy her debts. On the contrary, no circumstances existed there which would be likely to prevent the respondent from buying at that price and being willing to retain the land himself, if not soon wanted by her, when it was worth more than the consideration. or from taking the deed in his own name, being out of debt, or from paying with his own mon-

-ey in part, as he had money and she had not, or from getting credit for himself for the rent, as he had credit, or from holding it sometime as his own to benefit and oblige her, if she became able and willing to pay for it, as he was young and disposed by kindred and residence with her to accommodate her. Nor was there, on the evidence, a single circumstance to show that in this he had violated, or was for years accused of violating, any promise or duty to her so as to cause a resulting trust or mortgage.

In the next place is there 'sufficient proof to show a mortgage between them?

The test as to that in equity, there being no pretence here of a mortgage in law, is the existence of a debt between these parties for the consideration paid to Cutter, and which the deed to the respondent was executed to secure. See cases in Bentley v. Phelps [Case No. 1,331]; Almy v. Wilbur [Id. 256]; 1 Vern. 262; 1 Johns. Ch. 370; Taylor v. Luther [Case No. 13,796]; Flagg v. Mann [Id. 4,847]; 4 Johns. Ch. 189; Coote, Mortg. 24; Greenl. Ev. 288. There may be mortgages to secure bail, covenants, &c., and not debts. But there is no claim here that this was a mortgage to secure anything except a debt. Nor is it shown that Charles Tufts was a lender of money generally at that time, or that any note was taken for this as a debt, or any charge made of it to her. And the whole current of the evidence, though with some exceptions, is that she was not bound at all then to buy the land, unless she afterwards chose to do it and advance the money, rather than that she had thus bought it, and virtually mortgaged it for payment of the consideration. All the reasons, too, existed against her being a mortgagor of this land, which existed against her having a resulting trust, on account of her indebtedness to others, and telling them, as she did, that she had no interest in these premises to pay them with. Opposed to a mortgage, as well as a resulting trust, it also seems very likely that all her interest then rested in mere contract, and was so meant to rest. It was conditional, and depended on her option and pleasure afterwards, whether it should ever become a vested interest of any kind or to any extent. It rested on a special agreement or ordinary trust growing out of it—not a mortgage or resulting trust, on an agreement, to be sure, not very technical nor business-like in its terms, but one which, if executed, would operate kindly among relations, and which, if executory in its terms or conditions, and not able to be enforced on account of objections interposed, either legal or equitable, was an agreement, not in my opinion, as the respondents' counsel argued, so unusual or irrational as to be disbelieved under all the evidence and circumstances of this case. Even the bill does not purport to proceed on the ground of a resulting trust, or a mortgage, which she wishes to be opened for redemption. It avers no loan from Charles Tufts to her,

nor any mortgage. It proceeds rather on facts connected with the idea, either of a common trust in the original and subsequent purchase of this farm in her behalf, which has not been fulfilled, or an ordinary but valid agreement made in relation to the land in her behalf, which is set out in terms, as is a non-performance, by the respondent. And though a trust not being alleged in the bill, is not to be presumed or implied, unless necessary and clear (3 Swanst. 591; 1 Spence, Eq. Jur. 496), yet both a common trust resting on an agreement, and an agreement to some extent express rather than implied, are, in my view, quite clearly shown by the evidence, as before explained. Yet both a common trust, resting on an agreement, and an agreement of a certain character are perhaps sufficiently shown by the evidence.

The next inquiry, then, is what was that agreement or trust arising from it, and what are the objections, if any, which should oppose and defeat the execution of it, independent of the statute of frauds, and of the consideration of the agreement or trust, which will both be examined separately before closing. I pass by many subordinate points in the case, it being 'almost a Proteus in the shapes it has assumed, and do not go into the inconsistencies between different parts of the answer, or the want of credibility in that and several of the witnesses, or whether an answer is evidence or not, when responsive to the bill. That it is, see Russell v. Clark, 7 Cranch [11 U. S.] 70; Gould v. Gould [Case No. 5,637]; Morgan v. Tipton [Id. 9,809]. That it is not, but is a quasi bar till overcome by evidence, see 6 Clark & F. 295; 2 Daniel, Eq. Prac. 826; 1 Madd. 1; 1 Younge & C. 59. But I hasten to the trust or agreement to see what are their true terms and the objections to them, as on these the merits of the case in controversy must finally be disposed of. When the evidence was examined, which the complainant offered in order to prove the terms of the original agreement that she had alleged in her bill to have been made about the conveyance of this farm to her by Cutter and Cummings, it became clear, in the first place, that though it may have been finally settled when the deed was executed, yet it was arranged before and at the sale, and was then acted on. This is positively sworn to by one of the parties to it. It is also testified to, that the property was in fact knocked off to them at the auction sale of it by her, as executrix, at $1,000 less than others were then and there willing to give the same day. This was another strong feature or incident of it. The original purchasers also bought with a sole view to aid her by this agreement, both being engaged in other business, and one of them being her cousin, and desirous to assist her. This was another element in it, and no consideration whatever was advanced by her individually, in order to cause the agreement, but the reconveyance was promised to her in conse-

quence of this arrangement and sale to them, in order that she might have the benefit of it. This was the moving cause, this her only privilege, except that she was to remain on the premises by paying only the interest and taxes as rent, and take her own time for paying the principal, and asking a conveyance. But it was left entirely optional with her to buy or not, as her means might happen to permit, or the land become in time more valuable or not. After some years Cutter, in whom all the farm had become vested, being in need of money, and she being unable to raise it, her step-son, the present respondent, who had boarded with her since his father's death, and rendered some aid in paying the rent, and had acquired some property, was induced to come forward and take the land and agreement off Cutter's hands. She had like confidence in him as in Cutter, and he was therefore substituted for Cutter. He was to stand, as a witness swears, "in Cutter's shoes." I do not think it was an independent purchase, or new and different agreement in its terms and consideration, though it has been strenuously insisted by her counsel, that this arrangement with the respondent was an independent transaction, and that the old trust was entirely executed. In that view he urges it as a new trust or agreement created in the respondent, unaffected and uncontaminated by anything wrong in the first sale. But I think the balance of the evidence and circumstances is the other way, and at the same time is against the position taken by the respondent, that he did not promise or become liable to do all which Cutter was bound to do. The question, as one of fact, is difficult, and I wish a jury had passed on it, rather than the court. Yet the weight of facts and circumstances seems to me to indicate that the deed to the respondent, and his agreement and trust in conformity to it, were not made without full reference to the former agreement and trust to recover in a certain event, and without full reliance placed on it. But it was at the same time very far from being meant as the total execution of the old trust, and the creation of an entirely new one, or one of a different character. On the contrary, it was a mere continuance of the old one in new hands, the respondent knowing and promising to comply with the old one, and she asking that, and that alone. And whether he promised to do it or not, in all respects, which is questioned some in Charles Tufts' answer, and the argument of his counsel, he is still liable to do it, if he took the land merely knowing, as he doubtless did, all the previous trust attached to it. He took it cum onere. 2 Dru. & W. 31; 2 Ball & B. 304, 416; 1 Schoales & L. 262; 1 Ves., Sr., 498; 2 Vern. 271, 447; Lewin, Trusts, 205; 20 Johns. 421; 1 Johns. Ch. 305. From all the circumstances, that, and nothing either beyond or short of it, must manifestly have been the intention of both parties. He mere-

ly assumed the obligations and confidence which existed in Cutter & Co. for the same object and consideration and with like designs, and she merely desired that. Indeed, in the bill itself, it is alleged that Charles Tufts took the land under the same agreement as Cutter and Cummings, "under the agreement aforesaid,"--"holding said premises under such agreement as aforesaid." It is not set out, to be sure, as it is proved, in respect to the time the agreement was first made, but in other respects it is substantially the same. Indeed, though some parts of the written argument of the plaintiff contend that the old trust was executed, and a new trust formed, yet other parts make it a point, that both were the same. Thus "fifthly," after insisting that the trust had been executed, it is added, "Charles Tufts took the conveyance with knowledge of and subject to that trust, and therefore takes subject to it, or stands in a like situation," as Cutter, the first trustee, swears. Charles Tufts "was to hold the estate on the same understanding and agreement as C. had done," and Smith testifies "the agreement was that he, (Charles Tufts,) should step into Mr. Cutter's shoes." In short, a new promisor was merely agreed to be substituted for the old one, but to the same obligation, or a new trustee as to the same trust, or, in other words, the old agreement and trust were only assigned to Charles Tufts, he agreeing to do all which the assignor had been engaged to do, and the promisee in the agreement assenting to this assignment. It was as if a new tenant under a lease should attorn to the landlord and be accepted, instead of the old tenant, for the same rent or consideration. Afterwards, the respondent showed a disposition, not unnatural, to limit to ten years from her sale, or five years from Cutter's, the continuance of any right in her to have a conveyance of the premises on paying the original consideration and interest. The evidence, however, is, in my view, decidedly in her favor, that there was no such limitation, and though this gave her a great advantage, it was not a very unusual advantage, under all the circumstances of indigence and relationship on one side, and prosperity, if not wealth, on the other. In Welsh mortgages no time of payment or redemption is fixed. 3 Pow. Mortg. 947, 948; 3 Atk. 518. But then the mortgagee enters and takes the profits (1 Pow. Mortg. 373), and here the indulgence has some limit to it, probably, if the party chooses to resort to chancery and have the time for redemption or payment restricted to some reasonable period. She is entitled, then, to all the benefits of the agreement or trust, as it stood originally in Cutter and Cummings' hands, and is subjected to all the disadvantages or imperfections of it as originally made. These, in my view, are its terms, its privileges and defects.

Among the defects which have been deemed most prominent, its exposure to the plea

of the statute of frauds, on the ground that the agreement or trust was not in writing, and next, that illegality existed in the consideration for either of them. Besides these the agreement and trust, deeming them, as I do, throughout, to be the same in their terms, conditions, object and consideration, are open to some other exceptions as to their conditions, which it may be well to advert to before proceeding to the two most prominent. One of these others is, that the terms of the agreement and trust were, on the part of the plaintiff, not imperative, but resting only in her pleasure were optional, and hence were not valid. To this effect, certainly as a matter of fact, is the balance of the testimony, though not the whole of it.

This conclusion is, likewise, fortified by her own declarations frequently made, that she had no interest in the land, and hence everything must have been voluntary or optional with her in order to justify, in any true view, such declarations.

Conceding, then, that it was optional in the plaintiff to pay the original money or not, the trust or agreement could not, as a general principle in such case, be enforced for the want of mutuality. Cooke v. Oxley, 3 Durn. & E. [Term R.] 653; Routledge v. Grant. 4 Bing. 660. It will at once occur to every lawyer, that unless a party is bound to pay money to another, the latter is not bound to convey in cases like these. That there must be a duty or obligation usually on both sides, see 6 Paige. 288; 1 Cow. 733; 4 Johns. Ch. 497; Bunb. 111; Newl. Cont. 152; 1 Schoales & L. 13; 2 Story, Eq. Jur. p. 96; 2 Vern. 415; 12 Ves. 46; 3 Brown, Ch. 12; 1 Ves. Jr. 50; 18 Ves. 99; 6 Ves. 662; 5 Ves. 818; Hamilton v. Grant, 3 Dow, 33, and 1 Bligh (N. S.) 594; 2 A. K. Marsh. 346; 2 Story, Eq. Jur. §§ 750, 769; 16 Me. 92; 1 Johns. Ch. 282, 370; [Brashier v. Gratz] 6 Wheat. [19 U. S.] 528, 539; 16 Ves. 406; 7 Brown, P. C. 279; 4 Ves. 66; Walton v. Coulson [Case No. 17,132]; 1 Jac. & W. 465; 2 Freem. 35. There may be exceptions to this rule, which it is not necessary here to enter into. So there are various discriminations as to what does and does not constitute mutuality. Thus it may not be necessary to have mutuality, as it is argued, in an executed trust, that is one whose conditions are performed, and not one merely executory. 1 Hare, 34; 1 Craig & P. 63. But this trust is not considered by me as in this sense executed, and this very bill is brought to compel it to be executed. As already shown, a new trustee was substituted for an old one, but nothing more. So if the mutuality on one side consisted merely of a conveyance of land to the other, that, if done, might be sufficient to sustain an agreement to reconvey on the other side. But unfortunately that is not the whole of this case. The conveyance on the one side here was the mutuality for the consideration which was paid on the other side, and divided among the creditors of her husband's estate. But for the promise to reconvey on her paying a certain sum, there was no mutuality in any promise by her absolutely to pay such sum at any time and take the land. Nor was there any other consideration for the promise to reconvey, except the illegal one originally existing for them to buy for her benefit, and thus buying at a price quite $1,000 less than persons the same day offered to give. I do not, however, propose to decide the case on either of those points, but merely to call attention to the difficulties attending them. Nor do I decide whether time here was of the essence of the agreement or not, another question much argued and strongly insisted on by the respondent, though the inclination of my mind is it was not. See cases where time is material. 2 Story, Eq. Jur. § 776; 1 Sugd. Vend. 410–413; [Pratt v. Carroll] 8 Cranch [12 U. S.] 471; [Hepburn v. Auld] 5 Cranch [9 U. S.] 262; 4 Brown, Ch. 469, note; 7 Ves. 273; 16 Me. 92; Williams v. Ash, 1 How. [42 U. S.] 14; 5 Ves. 818; 6 Paige, 288; Tam. 381; 5 Ves. 720, note; 2 Story, Eq. Jur. §§ 771, 776; 13 Ves. 228; 2 Sim. & S. 29; [Brashier v. Gratz] 6 Wheat. [19 U. S.] 528; 1 Fonbl. Eq. bk. 1, c. 6; 1 Ball & B. 69. If property has altered in value, and the complainant has been dilatory or negligent (Walton v. Coulson [supra]; Longworth v. Taylor [Case No. 8,490]; Garnett v. Macon [Id. 5,245]), time is often material and affects the question of enforcing performance. In that view the great delay here is unfavorable to the plaintiff. Though it may alter the case some as to delay, considering that she was in possession of the estate, and hence did not tender nor bring her bill so speedily as otherwise would have been likely if not proper. Coote, Mortg. 22. But in short how could time be deemed a material element in a contract when that contract, in my view, had no time whatever fixed, within which it was to be performed, and when the other party never had resorted to chancery and obtained a limitation as to time; Nor do I decide whether the interest was payable quarterly or not, though the weight of the evidence and the character of the transaction both indicate that it was. If it was not, the respondent might be without interest or principal for years. But if payable quarterly, it might be in equity that a failure to pay at the day would be relieved against in a mortgage or trust, as properly as would a failure to pay the principal at an agreed day. But in a suit at law on the agreement this objection might be fatal. And in equity, seeking a specific performance of the agreement, rather than the execution of a trust, it would be very difficult for the plaintiff to succeed without showing she had complied with the stipulation as to quarterly payment of interest, if such in truth was the agreement. 3 Madd. 392; Wood v. Mann [Case No. 17,953]; 3 Atk. 133; 5 Russ. 42; Story. Eq. Pl. § 333. Without

this obligation to pay interest quarterly, the argument would ·be a strong one, that if the plaintiff was neither obliged to pay the principal within a given time, nor pay the interest quarterly, without forfeiting her rights, she might live there her whole life and pay nothing. She might, in this way, also have all the advantage of a large rise in the value of the property, and risk nothing. It would be difficult in equity to tolerate this. Sanborn v. Stetson [Case No. 12,-291]. The only answer to the inequitable if not illegal aspect of such an agreement would be, that the respondent in chancery might perhaps compel her in a reasonable time to pay the principal and interest, or have his land exonerated from the trust, and claims of any kind to it. See Almy v. Wilbur [Id. 256]; Skillern's Ex'rs v. May's Ex'rs, 4 Cranch [8 U. S.] 137. So if the contract proved varied essentially from that set out in the bill, that is fatal. 2 Ball & B. 369; 5 Ves. 452; 2 Ves., Sr., 299; 2 Ves., Jr., 243; 2 Schoales & L. 10; 1 Ball & B. 404; 5 Wend. 644. But the testimony is contradictory as to this, and if stronger for the respondent, an amendment would be allowed to the plaintiff. if she appear otherwise to have merits. It is sometimes allowed after an opinion delivered. 2 Colly. 389; 1 Craig & P. 62; 2 Schoales & L. 347; 1 Dowl. Prac. 520; Morgan v. Tipton [Case No. 9,809]; Almy v. Wilbur [supra].

The practice in chancery has long been very liberal as to amendments. As early as 9 Ed. IV. Chancellor Stillington said—"In the chancery a man shall not be prejudiced by mispleader or for default of form, but according to the verity of the matter." 1 Spence, Eq. Jur. 375. They have by acts of congress expressly prohibited objections of form in the courts of the United States from barring justice, whether in law or equity. If at any time before judgment is entered up an amendment is necessary, it is usually allowed, even in England, of late years. in an improved spirit to reach and enforce what is substance. 1 Spence, Eq. Jur. 253; Steph. Pl. 81. Indeed some amendments are made there after judgment, and writs of error are brought to reverse them. See United States v. Jarvis [Case No. 15,469], Maine Dist., October term, 1847; Morgan v. Tipton [supra].

Having gone over most of the special exceptions to the agreement, and to any constructive trust, I shall next proceed to the two general exceptions, and firstly, that of the statute of frauds. The mode of pleading this is objected to by the plaintiff. The plea refers to the "revised" statute of frauds, when the transaction occurred under the old one. But this seems much overcome by the circumstance that in this respect the two statutes are alike. 5 Metc. [Mass.] 168; 22 Pick. 430. Nor would it generally answer in chancery, if the statute of frauds is pleaded to hold the plea bad, and admit evidence under it, not competent by either statute, merely because in the reference to the statute it is recited as the "revised," rather than the old statute. If necessary to have an amendment in such case it would usually be ·allowed without much terms for reasons just stated in respect to amendments, where the evidence varies from the averments in the bill. Beside that, the pleading of such a statute and the relying on it are not to be discountenanced, because the law now not only imperatively requires written evidence as to important matters on grave public principles to prevent frauds and perjuries, but it is a reasonable mode of preventing them (Rob. Frauds, 157), and was required centuries before by the civil law, even as early as the days of Constantine. 1 Spence, Eq. Jur. 160.

Several eminent jurists have lamented that the strict construction of the statute was ever departed from. Looking, then, to the subject matter of this agreement, I have no doubt that it was one made in relation to the title of lands, or to the creation of a trust in real-estate, so as in either view to come under the prohibitions of the statute of frauds. The prohibitions of that statute extend to declarations or "creations of trusts" in land, as well as contracts concerning an interest in lands. 1 Spence, Eq. Jur. 496. Though they reach only to the proof of such trusts, requiring it to be in writing and signed, rather than requiring the creation of them to be in writing. Forster v. Hale, 3 Ves. 707, and Randall v. Morgan, 12 Ves. 74. Thus by the statute of 29 Car. II. (chapter 3), the clause creating trusts says they "shall be manifested and proved by some writing signed by the party," &c. See Rob. Frauds, 91. While the clause as to a contract or agreement creating an interest in land is differently expressed, and may be thought to require more matter as to the terms of the contract to be in writing (Rob. Frauds, 104), it is that "some memorandum or note thereof must be in writing. signed by the party," &c. Rev. St. Mass. p. 472, c. 74, is the same as the English one in respect to contracts, except it is expressly provided that the consideration need not be stated in writing. It had been so held before in 17 Mass. 123. And as to trusts (Rev. St. Mass. p. 408, c. 59), the Massachusetts provision is like the English one, and has no statutory exemption as to the consideration. But in England it has been held that the writing to prove a trust must contain the terms of the agreement. Seagood v. Meale, Prec. Ch. 560; Rob. Frauds, 106; 1 Atk. 12; 6 Brown, P. C. 45; 3 Atk. 503; 3 Brown, Ch. 318; 1 Ves., Jr., 330; 2 Bos. & P. 238; Cooke v. Tombs, Anstr. 420. So must the writing to prove a contract. 10 Bing. 383; 2 Barn. & C. 627; Story, Sales, § 269. And one of the terms of the agreement is held to be the consideration, according to 5 East. 10; 8 Johns. 29; Rob. Frauds. 119; 2 N. H. 414; 3 Johns. 210; 4 Barn. & Ald. 595;

3 Brod. & B. 14. But the correctness of this view has been drawn in question in other states than in Massachusetts, holding the writing sufficient, if showing the promise or terms of it, and not the consideration. 6 Cow. 90; 14 Ves. 189; 15 Ves. 287; Smith v. v.-Ide, 3 Vt. 290. Whether, then, this case be regarded as an agreement to reconvey on certain terms a tract of land, or to fulfill a common trust concerning them, which grows out of that agreement, and is identical with it in its terms, it must be proved by some writing signed by the party to be bound (2 Bos. & P. 238; 1 Ves., Sr., 82), and the paper or writing must contain the terms of the contract, and if it be a trust, the writing may, even in Massachusetts, be required to show the consideration, though otherwise if a mere contract. But I do not decide this last point concerning the consideration, whether necessary to be expressed in writing or not.

Suppose it is not in Massachusetts, how would the matter then stand in the present case. The only writings attempted to be shown in relation to it here are the accounts and books of Charles Tufts, under his signature, and hence sufficiently signed perhaps to prove legally all they contain. But what do they contain? Not the original agreement itself, or any of its terms. They show charges of interest and rent to the plaintiff by the defendant, and show sums paid by the latter for this estate, and gravel and trees sold by her, and matters of like character. But they do not make any charge against the plaintiff, as if he had bought the farm on her account as an agent, and loaned to her the money on credit; or contain any statement conforming to the terms of the agreement as set up in the bill to convey the farm to her on receiving the consideration he had advanced with interest thereon. Nor do they disclose the fact that though buying it nominally on his own account, and opening a separate head with it as "The Cambridge Estate," he held it under a trust, the specific terms of which are detailed and can be ascertained without parol evidence and without some of that danger of fraud and perjury which the statute of frauds and perjuries was made to guard against. It is true, however, that they contain charges against her of interest paid in several instances, which, from the amounts, were probably the interest on the consideration advanced and secured by him for this farm. But as she occupied the farm with and under him, and the legal title being in him, this interest and the taxes might be charged as rent, as in some subsequent years after 1839, the item was charged eo nomine to "rent." These written charges against her do not, therefore, show with so much certainty that there was a contract such as she now sets up, because they are consistent with the idea of a lease to her with very liberal indulgences towards a mother-in-law, or if accompanied by some special agreement or corresponding trust, not under one very clearly of the exact tenor now claimed. But certain independent or collateral facts are next proved, which are supposed to remedy this defect in the written evidence as to the terms of the agreement, and even to be sufficient to prove the contract or trust under the statute, independent of the writing. There is first her continued occupation of these premises ever since the death of her husband, and as fully after the first sale in 1828 down to the 1842, as before. This, however, is impaired some by his residence with her till his marriage in 1840. There is next her improvements made in the buildings which, though disputable in their value, have clearly been considerable. There is her seeding the ground, planting trees, selling much gravel, assenting to and being consulted as to sales of some of the land, making leases of it, and trying to raise money on it to pay Cutter and Perkins, without resorting to the direct parol testimony of Cutter in favor of the trust and agreement in the form now set up, as well as that of numerous other witnesses concerning confessions and acts of some of the parties to such a trust and agreement. All these combined raise a very strong presumption that a trust or agreement of some kind existed in her favor, and probably much like what is now set up. And some of the acts indicate a part performance of such a possession so long a time and exercising so many acts of ownership. 3 Swanst. 593; 2 Story, Eq. Jur. §§ 759, 761; Newl. Cont. 181–187; 3 Ridg. 518, 519; 1 Sugd. Vend. 201. But if these acts can otherwise be accounted for, they do not prove a sale. Rob. Frauds, 155; 3 Ves. 713. Some cases hold, also, that these acts of part performance, in order to avail, must be such as to injure the plaintiff if the contract is not carried into effect. 15 Mass. 93; 18 Ves. 328; 1 Schoales & L. 41; 1 Ves., Sr., 297; 14 Ves. 386; 7 Ves. 341. Some hold that it must tend to defraud him, or else the statute must operate. But in this way all the evidence as to a part performance, when combined together, is quite strong to show a trust existing such as is before stated, and it is defective only in making out all its terms, except by parol. That is the great hiatus in this part of the evidence.

On what is a part performance and sufficient to take a case out of the statute, the authorities are numerous. See 14 Ves. 386, 488; 3 Ves. 378; 1 Schoales & L. 41, 123; 7 Ves. 341; 2 Story, Eq. Jur. §§ 750, 763, 764; 1 Sugd. Vend. 200; 6 Ves. 467; 1 Johns. Ch. 283, 284. Coupled with the admissions in the answer as to parts of the trust and agreement, the legal proof might be sufficient to show that some trust existed. Yet it would, as thus admitted, be a trust like the agreement, optional with the plaintiff; a favor, too, rather than a right, as not mutual, and limited in time, and for the same consideration with that existing between her and Cutter. Nor

is the other evidence strong enough to vary what the respondent admits, except as to the length of time the privilege was to be enjoyed. But whether the admission, if taken at all to eke out the other testimony, must not be taken as a whole in the whole answer, is another difficulty (Gres. Eq. Ev. 304), and one which it is not necessary to attempt now to solve, for reasons which will be hereafter stated.

In respect to the money paid here, it is objected that money paid in part is not deemed a part performance, because it can be recovered back if the sale is not executed, and thus no fraud or injury be necessarily inflicted. Rob. Frauds, 134; Hollis v. Edwards, 1 Vern. 159. This course of reasoning, showing no injury or fraud by this result, will in some decree obviate the effects of other improvements or acts being considered as part performance or part payment, if compensation can be made for them, and I am inclined to think if the case was not taken out of the statute, she can be compensated in some way, and should be, if anything be due. Rob. Frauds, 134, 154; 3 Ves. 713. When forced out of possession she would in most states be entitled to compensation for any improvements made by her under a supposed interest or title, being called betterments. See Laws in Maine, N. H., and Vt., as to betterments, and in Ohio, Kentucky, &c., as to occupying claimants. See the civil law on this, and Withington v. Corey, 2 N. H. 115; 20 Mart. 609. So it is held in Bryan v. Bancks, 4 Barn. & Ald. 410, if the tenant is led by the course of the landlord to make improvements, he may get his pay in equity. Usually one must not make improvements without a supposed title or interest in lands. 5 Johns. 272; Green v. Biddle, 8 Wheat. [21 U. S.] 1; Bartle v. Coleman, 4 Pet. [29 U. S.] 186. So one must not willfully mix his goods or labor with another's, or he will lose it. In some cases when the owners look on and expressly or impliedly assent to such improvements, an action lies for money paid and expended on their account. Rob. Frauds, 134, 154; Beers v. Haughton [Case No. 1,230]; Gray v. Munroe [Id. 5,-724]; 3 Ves. 713. Where one bought and entered and was then evicted for a fraud in the deed to his grantor, a bill for the improvement made was sustained against the legal owner. Utterbach v. Binns [Case No. 16,809]. Special laws, like those just referred to, exist in many states, authorizing commissioners to appraise such improvements made under a supposed title, and making the owners pay for them. Parsons v. Bedford, 3 Pet. [28 U. S.] 457. So a jury may do this in New Hampshire and Maine. Society for Propagation of Gospel v. Wheeler [Case No. 13,156]. See Webster v. Cooper [Id. 17,333], Mass. Dist., October, 1847; Parsons v. Bedford, 3 Pet. [28 U. S.] 457. Or let them be deducted from mesne profits

received. 2 Johns. Ch. 441; 2 Kent, Comm. 334–339, and note; [Society for the Propagation of Gospel in Foreign Parts v. Pawlet] 4 Pet. [29 U. S.] 480. And in this state (Massachusetts) there was such a law passed March 2, 1808, under which have occurred various decisions. See 2 Metc. Laws, p. 178, c. 74; 17 Mass. 350; 6 Mass. 303; 15 Pick. 141, &c. The occupying claimant law of Kentucky is similar in character, and the jurisdiction of chancery over the matter is maintained by averring mistake or accident in making the improvements, or a trust arising in him to pay for them, who has been benefited by them. The occupying claimant law in Ohio, under which commissioners appraise the value of improvements by tenants, has been held to be constitutional so far as regards our own citizens. [Bank of Hamilton v. Dudley] 2 Pet. [27 U. S.] 525; Bonaparte v. Camden & A. R. Co. [Case No. 1,617]. The betterment laws are constitutional for future cases as to our own citizens. Society for Propagation of Gospel v. Wheeler [supra].

In another view, also, there may be a remedy, as where a specific performance of a contract is defeated by a plea of the statute of frauds, any money advanced must be refunded. Johnston v. Glancey, 4 Blackf. 99; 1 Sugd. Vend. 145, note; 2 Hov. Frauds, 4; 1 Schoales & L. 129; 1 Vern. 159. In Fay v. Valentine, 12 Pick. 44, it was held that if one promises not to redeem, though the promise is not enforcible, he will not be allowed in equity to recover against it; if there be not good faith and justice in the plaintiff, he must not expect aid of a cour: of equity to sanction a violation of his engagement. It is to be conceded, however, that some of the proof of these acts relied on as part performance, is in writing, such as those before named of the sale of gravel and trees credited in the respondent's books, and that others are rendered probable by several independent facts and acts looking like part performance; and 1 entertain little doubt, therefore, that some such agreement as is contended for by the complainant existed originally, and that it was renewed by the respondent, though it is certain that some of the counter evidence as to her declarations denying the possession of any interest or property to pay her debts, is strong, and many of the favors and indulgences to her by her step-son are susceptible of being considered kindnesses, rather than the result of an agreement or trust which the parties deemed binding in justice and honor, if not in law. I shall not, therefore, dispose of the case on this ground. See Jenkins v. Eldredge [Case No. 7,269]. See cases showing how much of the trust or agreement must appear in the writing. 9 Ves. 253; 3 Mer. 53; 4 Taunt. 209; 3 Atk. 503; 1 P. Wms. 770, and note; 2 Vern. 288; 2 P. Wms. 412; [Morris v. Nixon] 1 How. [42 U. S.] 118; 3 Ves. 686; 1 Sugd. Vend.

166; 1 Atk. 449. If the substance does not, the danger of fraud and falsehood is not renewed. Without going farther into this difficulty now, the following cases show to what extent it may be relieved by parol evidence: 1 Ves., Sr., 76; Barnard. 30; 4 Brown, Ch. 62, 472; Coote, Mortg. 26; Hill, Trustees, 522; 2 Atk. 71; Sugd. Vend. c. 20.

The case, then, stands thus under the first leading objection interposed of the statute of frauds, that there may be enough proved by writing, by occupation and improvements on the land, and admissions in the answer, (to recapitulate nothing more,) to be satisfactory that some special agreement and consequent trust existed on the part of the original purchasers, as well as of the respondent, to reconvey the premises on some terms and conditions, but, there being doubts as to the exact character or extent of those terms and conditions without a resort to parol evidence, I leave this point unsettled, and I do this the more readily, as the next and last objection is, in my view, fatal to the bill. And I shall therefore proceed to it without saying more either on this or some other kindred positions advanced in the arguments.

The other fatal objection just referred to, is the consideration in which or for which the transaction originated, the shade cast over the transaction, and over the claim made here by the illegality of that consideration. The law in relation to this is really not so much in dispute as the facts. For one side argues here from the idea of a consideration connected only with an executed trust, and contends the respondent's agreement and trust to be new, and the old trust to be executed, and if so, its consideration not to be material. For this is cited 4 Hare, 74; Hill, Trustees, 83; 1 Hare, 474; and various other cases. While the other side, and as before shown, correctly in my view, treat this case of the collateral undertaking to be as it stood originally, and hence to be an executory trust in respect to its conditions founded on a like consideration. Again, one side argues that the original transaction of the sale was only voidable, and that in a particular way or form, and by particular persons, while the other side, somewhat contrary to my views, holds it void and hence assailable by any person and under any form. Again, one side regards the objection now urged against enforcing the collateral agreement as setting aside the original sale, while the court regards it as leaving that sale untouched, and merely declining to interfere to help execute a collateral and improper agreement or trust connected with that sale.

Much of the reasoning and many of the cases cited on both sides relating to this point in the inquiry rest, therefore, on principles or facts different from those on which rest the conclusions of the court, but are very sound reasoning and very pertinent cases, looking to the principles and facts on which the counsel for the complainant argue. I shall go at greater length into this point of the consideration, as it has been most mooted at the bar, and requires careful discriminations between much which seems on the face not very unlike it, nor particularly different. Observe that in this view it is not the want of any consideration which is here interposed against enforcing the executory promise or trust, as the deed of the land at a price below its value may have been some consideration, not a mere nudum pactum. But it was that this inducement, this difference was a consideration which belonged to heirs and creditors, and which the executor had no legal right to use for her private benefit. It originated in an act forbidden by public policy and illegal, and this constitutes the strong objection to aid the plaintiff to enforce it. In this case the plaintiff, being an executrix, undertook to obtain an interest in the estate as an individual, which she was selling as a trustee for the benefit of the creditors and heirs. It turns out in evidence that she did this by a previous agreement with the purchasers, and that the estate was thus in fact bid off for less than others present were willing to give, and was held under this trust or parol agreement on this consideration, and no other, to be reconveyed to her in her private capacity, whenever advancing the purchase money and interest. But no advantage is taken of this in answer, as it is not set out in the bill as made before the sale, nor since it was disclosed in evidence has any supplemental answer or cross-bill been put in, making use of it to defeat the plaintiff from enforcing such a trust or agreement, though there has been a motion to put one in, if necessary. Now were this bill founded on the deed or sale, which has been executed and carried into effect, and this objection was to avoid that, such a conveyance could probably not be avoided, except by heirs or creditors under appropriate pleadings. Of this more hereafter.

I do not decide this point, as not necessarily arising, but throw out this impression because, though such conduct by an executrix is unfaithfulness to her trusts, and dangerous as a matter of public policy to be upheld or enforced, yet it is perhaps only voidable, and not void after it is executed. Van Epps v. Van Epps, 9 Paige, 242; 13 Pick. 159; 4 Kent, Comm. 438; 4 Cow. 717; 2 Cow. 196; Veazie v. Williams [Case No. 16,907]; 2 Burge, Col. Law, 459. The material distinction for this case between void and voidable is this: An act is void which when done was bad or against law in respect to the whole community, and nobody is bound by it. But it is voidable, if only bad as to a particular person, who may or may not avoid it. Bac. Abr. tit. "Void and Voidable." So when void, it may be so treated after by any person, and without a special plea or motion, but when voidable, it is otherwise generally if it has been executed. If the present collateral agreement was, there-

fore, void, it would make no difference whether it has been executed or not, for in either event it could not be upheld probably, even as the pleadings now stand. But it probably is not void in this sense of the term. A thing is void in this sense and with this fatal effect when the consideration or purpose or act was malum in se, as murder, for instance, or malum prohibitum, as an offence, because both are prohibited on account of the community at large. Every moral man is, in some points of view, as much bound to avoid what is malum prohibitum as malum in se. 2 Bing. (N. C.) 646; 2 Bos. & P. 370; 7 Greenl. 113; 1 Emerig. 210, 542; 7 Wend. 276. Beside what has already been referred to in respect to the distinction between what is void and what is only voidable, it may be necessary to look at other illustrations in some detail, in order to settle, which of the two the present collateral contract and its consideration were. Because if they were void, technically the objection against the bill might prevail, even if they related to an executed agreement or trust, and on the present state of the pleadings. Thus, on the principle already stated, that some acts may be void as to some persons and purposes, but not others, such acts are regarded as usually only voidable. Thus, if some of the parties are femes covert or infants, and others are not, it is good as to the others. So a fraudulent gift is good against the donor, though not against creditors. Cro. Eliz. 445. Hence one conveying to defraud creditors cannot enforce the trust on the grantee (20 Pick. 247), nor set it up in any way, unless it has been executed. Then he may. Flagg v Mann [Case No. 4,847]; Hunter v. Marlboro' [Id. 6,908].

But such conduct as the complainant's is against public policy, and is certainly not to be upheld as a general principle, whether it be called void or voidable. 1 Sugd. Vend. 226, 237; Lewin, Trusts. 376; Dana, 188; 11 La. 48; 11 Mart. (La.) 297; [Wormley v. Wormley] 8 Wheat. [21 U. S.] 441; 1 Paige. 397; 13 Pick. 28, 276; 1 N. H. 186; McLean v. Lafayette Bank [Case No. 8,888]; 2 Johns. Ch. 252; 3 Bing. 254; 4 Bin. 43; 5 Har. & J. 147; 2 Madd. 338; 10 Ves. 292; Michoud v. Girod, 4 How. [45 U. S.] 503; 3 Johns. Ch. 29; 13 Johns. 112; 2 Ves. Sr. 238; 5 Johns. 194; 8 Johns. 144; 2 Caines, Cas. 183. Though the title passes by the deed, it is subject to be devested in such an event. 11 Ves. 165; 13 Ves. 581; Newl. Cont. 6, 471; 1 Ves. Sr. 9; 2 Schoales & L. 661; Hawley v. Cramer, 4 Cow. 718; 1 Spence, Eq. Jur. 512, and note. The Case of Mackintosh. 1 Bing. 50, cited against this general principle, is where the sale was made to one of the trustees who had before renounced the trust, and hence stood in no fiduciary capacity at the time of the sale. The language in the books as to what is void or only voidable, is not always purely technical. Sales like the present have, therefore, been at times called void. as in Michoud v. Girod, 4 How. [45 U. S.] 503, yet they are not considered as preventing a ratification by heirs or cestui que trusts, if sold for consideration enough, and they should prefer the consideration to the land itself. The words "void" and "voidable" are often indiscriminately used for the last; meaning, in both instances, that which may be deemed a nullity by proper persons and in proper modes. And sometimes the substitution of another sham purchaser, per interpositam personam, is regarded as strong evidence of real fraud, and hence the sale in such case is at times deemed actually void. See cases cited in the above case in 4 How.; 1 Ves. Sr. 9; 2 Schoales & L. 661; 4 Cow. 718. Then the maxim may apply, "He that hath committed iniquity, shall not have equity." Fran. Max. 2. This means iniquity, not merely moral, nor necessarily what is against sound morals, but anything illegal. 7 Ves. 473; 1 How. Frauds, 163; 1 Spence, Eq. Jur. 422; Jones v. Randall, Cowp. 38; 1 Bos. & P. 296. But whether the act is utterly void or only voidable here, remains to be settled on sound principle.

None standing in a fiduciary relation, like executors and agents, are, without special license, permitted to buy the trust property, either at public or private sale made by themselves, because it opens a door to fraud and injury to the rights of the principals, and gives to the agents an undue advantage, and the law, therefore, prohibits it in order to remove temptation and prevent probable usury. Indeed, the agreement or trust, if of any advantage, and it is difficult to see why it is created if of no advantage, is manifestly obtained, not by the trustee's own private funds, but by the property of others, the cestui que trusts. The transaction, in such a view, then, is clearly immoral when the consideration to be received for the cestui que trusts is less than the true value of the property, because the difference, belonging to others, creditors and heirs, is pocketed by the executor or agent in his private capacity, without paying anything for that difference from his own funds. Nor is such a sale legal if the consideration was ample, though it would then not be plainly immoral or fraudulent. For public considerations it is forbidden, and is wrong absolutely, though the party likely to be injured by it may waive objection and confirm it. It is still wrong, and will continue to be wrong till the principal clearly ratify it, knowing the injury attempted, if one was attempted, and overlooking it. 4 Kent. Comm. 438, and cases cited there; Story, Ag. §§ 11, 200. So is the civil law. But it can hardly be said, speaking technically, that the conduct of the plaintiff, unless selling for too small a consideration, would be evil in itself, malum in se, or be prohibited by statute, malum prohibitum, though it would be against public policy. And contracts merely against public policy have frequently been pronounced void, and not only voidable. Thus is it said "there can be no doubt that

any contract made in fraud of the law or against public policy is void" (Piatt v. Oliver [Case No. 11,114]), and will ever be set aside as a matter of course ([Id. 11,115]; 1 Story, Eq. Jur. § 318; 2 Johns. Ch. 252; [Wormley v. Wormley] 8 Wheat. [21 U. S.] 421; 1 Paige, 147; 4 Cow. 682; 3 Johns. Ch. 29; 6 Johns. 194; 13 Johns. 112; 4 Cow. 732; 4 Johns. Ch. 254; 1 Story, Eq. Jur. 290–293; 6 Ves. 625; Cowp. 395; McLean v. Lafayette Bank [Case No. 8,888]). "Arguments drawn from considerations of public policy have and ought to have great weight, both in equity and at law." Parsons, Chief Justice, in Boynton v. Hubbard, 7 Mass. 118. Thus marriage brokerage bonds, though not fraudulent, have a bad tendency, and hence are "void" and "relieved against as a public mischief for the sake of the public." Id. So bargains to procure offices. So post obit bonds and measures affecting legacies. Courts in their decisions respect the public policy of the realm, whatever it may be, on any subject. 1 Chit. Comm. Law. So again, "there are numerous cases in the books where an action on a contract has failed, because either the consideration for the promise, or the act to be done was illegal, as being against the express provisions of the law, or contrary to justice, morality or sound policy." Wetherell v. Jones, 3 Barn. & Adol. 225. "It is a fundamental rule, that all contracts which have for their object anything repugnant to the general policy of the law, or contrary to the provisions of a statute, are void" (Chief Justice Spencer in Thallhimer v. Brinckerhoff, 20 Johns. 397), or in conflict with the settled policy of a state (Bank of Augusta v. Earle, 13 Pet. [38 U. S.] 519). So if the act done is illegal, though not immoral, still other cases than what have been cited consider it void. See ante, and [Bank of U. S. v. Owens] 2 Pet. [27 U. S.] 527; Bartle v. Coleman, 4 Pet. [29 U. S.] 184. "A thing is void which was done against law at the very time of the doing it." 7 Bac. Abr. tit. "Void and Voidable." [Ocean Ins. Co. v. Polleys] 13 Pet. [38 U. S.] 157; Steers v. Lashley, 6 Durn. & E. [Term R.] 61; [Ogden v. Saunders] 12 Wheat. [25 U. S.] 264, 275. And it is added that "no person is bound by such an act." "Every stranger may take advantage" of it. 2 Lev. 218; 7 Bac. Abr. tit. "Void and Voidable," F. But this last must perhaps be with some allowances. Instances of void acts are not only obligations to do what is malum in se and malum prohibitum, but "bonds to oblige persons to neglect their duty to the king and kingdom are absolutely void." Id. B. Even a vendor of secret medicines cannot have an injunction against others for imitating and using his marks. Fowle v. Spear [Case No. 4,996], July, 1848; Pidding v. How, 8 Sim. 477. It follows, then, that though the sale and agreement in this case were both illegal and against public policy, as will soon be shown more fully, and though for either of these causes a contract is often held to be void, yet it may be, this is one of those cases where either the sale or agreement, if executed—that is, carried into effect—cannot be avoided, except by particular persons who may have been injured by it. Whelpdale's Case, 5 Coke, 119; Bac. Abr. tit. "Void and Voidable," E.

Besides the cases already cited, it has often been held that an executed contract cannot be avoided, unless the illegality was set up technically as a defence in some of the pleadings or answers. 15 Pick. 23; 6 Pick. 452; 13 Pick. 272; 14 Pick. 345; 7 Pick. 8; 10 Pick. 111. And unless it was set up by the party or person on whose account it is made voidable, and not by others, as to whom the transaction may be valid. See above, and 2 Johns. Ch. 254; 5 Ves. 682; 12 Ves. 477; 3 Ves. 740; 6 Ves. 627; Jac. 418; [Finlay v. King] 3 Pet. [28 U. S.] 364; 1 Paige, 147; 5 Pick. 519; 6 Halst. [11 N. J. Law] 385. The cases of annuity bonds may be sui generis and avoided, if contrary to statute, whether asked by a party doing wrong or not, but this is under express statutory provisions. 13 Ves. 587, note; 9 Ves. 13, 292; 1 Ves., Jr., 50; 4 Ves. 129; 5 Ves. 235. And such may be some cases of gaming. 1 Spence, Eq. Jur. 626, note; Story, Eq. Jur. § 304; 2 Freem. 221; 1 Salk. 343; 2 Burrows, 1077. Supposing, then, the sale here and the agreement to have been only voidable, and both executed, neither could probably be anulled on the present pleadings. Thus, in Kerr v. Lord Dungannon, 1 Con. & L. 335, where an estate had been bequeathed to A for trusts to several, and then demised to A for too low a rent, and the lessee sold, it was held to be void on proper pleadings, as the trustee was gaining by the transaction, and the purchaser knew it, though without such pleadings it was not permitted. The lord chancellor said: "But I hold it to be a settled principle, that if a man has an equitable interest and comes into court in support of that interest, if the defendant has a strong case to show that no such equitable interest ought to have been granted, as in the present case, that no such lease ought to have been executed, in general the defendant may file a cross-bill, and then the case comes regularly before the court. If the case come thus before the court, I am inclined to think it would give the plaintiff great embarrassment." Id., Con. & L. 359. He was not at liberty to let a person come into court to set up such a title. It is fraudulent, and must dismiss the bill. In that case the agreement was held to be voidable in strong terms, and being executed, was on a cross-bill by a proper party avoided. So as before suggested, a sale to defraud creditors is good against the grantor, and good in hands of a second bona fide purchaser without notice of fraud, and good in the hands of the original grantee till avoided. The possession is legal till then, but the sale may by proper pleadings be set

aside. Bean v. Smith [Case No. 1,174]; 9 Mart. (La.) 649; 20 Pick. 247. But see 1 Day, 527, note; 3 Johns. Ch. 371. It must be avoided in Louisiana before a sheriff can seize the property by a bill in chancery, or a suit revereaterim. Yocum v. Bullit, 6 Mart. (N. S.) 324. By the civil law, also, an executed contract was avoided by "the party complaining," "by a recissory action." 1 Spence, Eq. Jur. 323; Dig. xxi. 1, 1, 2. Indeed, in some states, as for instance Louisiana, a fraudulent sale of land accompanied by possession cannot by express law be avoided in any collateral proceeding, but must be done by a separate suit or bill in chancery. Bean v. Smith [supra]. And if a sheriff seize the property as still belonging to the fraudulent grantor, he will be enjoined till the title is avoided in a distinct proceeding instituted for that purpose. See Code Prac. art. 303; Ford v. Douglas, 5 How. [46 U. S.] 143; Yocum v. Bullitt, 6 Mart. (N. S.) 325. In other states the sale may be avoided collaterally, though a judicial sale under a license from a court of probate. Rhoades v. Selin [Case No. 11,740]. And if a trustee sell by license, and the trustee become interested, the cestui que trusts may have it set aside and new sale ordered (Davoue v. Fanning, 2 Johns. Ch. 252), and it makes no difference if done at public auction, and a fair price be obtained, and a third person bought for the benefit of the wife of the deceased, as here. Id., and Hendricks v. Robinson, 2 Johns. Ch. 311. No matter whether actual fraud existed or not (Lewin, Trusts, 266, 377, 378; 10 Ves. 385), though even chancery regarded every breach of trust as a fraud (1 Spence, Eq. Jur. 621, note).

For reasons like these it has, therefore, been suggested in the progress of this case, that if the sale was voidable, or even void in the milder sense some use the term, it having been executed, stands good till avoided by the proper person, and in a proper manner, as by a supplemental answer, or cross-bill, or amendment of the original answer setting up the illegality, and in behalf of a creditor or heir. Often in such cases the illegality must be spread on the record in chancery, (though at law under the general issue the question may arise,) in order to show the grounds of decision, and that what is only voidable is to be avoided by a proper person, if it has been executed. Unless, then, the proper parties object, and object probably on the record, and not on the hearing merely, when the record shows nothing illegal or by way of exception, it is doubtful whether the court can regularly interpose and dismiss the case of an executed contract, on the ground that such a sale was voidable. Though the defendant is one heir and one creditor here, it may be that alone he could not object, but that it must be done by all or a majority, and by a bill or otherwise (1 Jones & La T. 120, and Con. & L. 457), after notice in the probate court for

them to unite or disagree. It is said here, also, that some attempt was made by some of the creditors to avoid the proceedings of the sale when the plaintiff's account was settled, and that the account has been so long settled it could not be reopened. But where faud has occurred, a sale may usually be avoided at any time, on its discovery, and in a case like this the property be sold again. Bean v. Smith [supra]; Michoud v. Girod, 4 How. [45 U. S.] 503. This last was a case of this character, and avoided after the lapse of near a quarter of a century. I am not aware that under the laws of Massachusetts the rule is at all different from that adopted in Michoud v. Girod. This depends on the views and wishes of the creditors or heirs. Such a purchase may be permitted beforehand by the court sometimes in certain cases, and on certain terms. Lewin, Trusts, 381. The heirs and creditors may not be injured by it, if the sale was for a full consideration, and the land has since fallen in value, and hence they may not wish to have it avoided. 2 N. H. 221–225; Brackett v. Tillotson, 4 N. H. 208; The Tilton [Case No. 14,054], and cases cited there. They have their election. It will be sold, then, after such a discovery, under order of the court of probate, if necessary to pay creditors, and the excess of consideration obtained will go to their benefit, or if not needed to pay debts, will go to the heirs. [Michoud v. Girod] 4 How. [45 U. S.] 503; 20 Pick. 510; 7 Pick. 1; 14 Pick. 405. To be sure, there must not be manifest laches or neglect by the creditors or heirs to avoid the sale, or time will impair their rights. Lewin, Trusts, 390; 15 Mass. 264; 6 Pick. 330; 20 Pick. 510, and cases. But time cannot begin to run till they know the facts and know their rights at law or in equity to get rid of the sale. 9 La. 855; Fonbl. Eq. 509, 519; Michoud v. Girod, 4 How. [45 U. S.] 503; Story, Cont. § 227.

For reasons like these the sale itself of the land having been executed, or the conveyance completed, I should not feel satisfied to avoid that sale, whether regarded as void or voidable, without proper pleadings and by proper persons, such as creditors or heirs.

Nor is it necessary to grant the motion which has been made in the argument for the respondent, as a creditor and heir, to file a supplemental answer, asking that the sale be avoided as illegal and against public policy. For there is another question back of this which disposes of the case, and which is well raised probably without such a bill. It is not whether the sale itself is here or can here be annulled, as the pleadings now stand, or as they may be amended. But on the contrary, it is whether the agreement or trust collateral to the sale, and connected with it, was not founded on an illegal consideration, and if so, whether, when not executed, as it has not been, they can be enforced if objected to, as the case now is,

leaving the sale itself untouched and unavoided, by this bill and this defence. The respondent, so far as a creditor and heir, cannot really desire here to avoid the original sale to Cutter and Cummings, and theirs to him under full notice of the facts, because that would injure him as a purchaser more than he would gain as creditor or heir. But his object must be to avoid or prevent the execution of the agreement, collateral to the sale and not yet executed, or carried into effect in its material conditions. Whether he can do this without first avoiding the sale, and whether he can do it on the present pleadings, is next to be considered. I am inclined to think that much less is required to defeat the execution or fulfillment of an executory contract which is illegal and only voidable, than to avoid such a contract after executed. When I speak of executory and executed agreements or trusts in this case, I do not mean agreements or trusts promised to be formed or created, and those actually formed or created, but those formed or created and not yet fulfilled, if executory, but fulfilled if described as executed. And that a court may, on very general principles, and without much formality in pleading, decline to be a party to, or give aid to execute a voidable sale or a trust and agreement connected with it and against public policy and sound principle, and not voidable on a mere personal exemption or privilege. 2 Story, Eq. Jur. § 769; 1 N. H. 184; 2 Vern. 470; Fuller v. Dame, 18 Pick. 472; 11 La. 48; 14 La. 114; 11 Mart. (La.) 297; Collins v. Blantern, 2 Wils. 341; 2 Bing. 247; Flowers v. Sproule, 2 A. K. Marsh. 57; 1 Hill, 293; 4 Bibb. 70; Mills v. Goodsell, 5 Conn. 475; Saltmarsh v. Beene, 4 Port. [Ala.] 283; 5 Wend. 579; 3 Cow. 299; 3 Paige, 154–158; 2 Caines, Cas. 133; 2 Ch. Cas. 196; 1 Eq. Cas. Abr. 228; Evans v. Richardson, 3 Mer. 469; Whitby v. Parken, Turn. & R. 366; Jac. 418; 1 Bell, Comm. 292. Why should the court shut its eyes to the illegality of the claim? Because the sale itself may not have been avoided by the heirs or creditors. Why in the mean time aid a party to do another thing about a collateral contract which is against public policy? 2 Story, Eq. Jur. § 769; 7 Ves. 470; 10 Ves. 292; Broom, Max. 350; 7 Scott, N. R. 499; 2 Ch. Cas. 196; 1 Eq. Cas. Abr. 228. Nor is it against one of those kinds of public policy which is questionable in its character (2 Bing. 247), but it is a clear policy reprobating such transactions in almost every age and country where jurisprudence is a science, and especially when, as here, the consideration obtained was less than the true value, and thus, if designed, a benefit was sought to be secured immorally by the agent in his individual capacity, at the expense and loss of this principal. But even when no immorality de facto appears, the transaction is so dangerous, so corrupting in its tendency, so open to alarm, so much against public policy, courts will set it aside (Downes

v. Grazebrook, 3 Mer. 209; Twining v. Morrice, 2 Brown, Ch. 331), if executed, on a proper application, or if executory and objected to, will refuse to enforce it.

It is considered by Spence on Equitable Jurisdiction (part 1, p. 437) that to annul contracts because against public policy is one of the peculiar provisions of a court of chancery. And he considers this very case as one of them, and cites it among the cases thus to be annulled, (and if annulled after executed, certainly not to be enforced before executed,) and assigns reasons for it, and not merely cases mala in se, but "on the ground that from the circumstances under which the parties stood as regards each other, or for other reasons of a general nature affecting not only the particular cases, but all others of a like nature, if such transactions were permitted to stand, it might afford an inlet to fraud or unfair or improper practices without the means of their being detected, or might enable one of the parties to obtain an advantage even unknowingly, which he ought not to be permitted to retain." He goes to the avoidance of an executed contract in such case, if against public policy, though then perhaps under different pleadings. And occasions often arise to avoid executed, as well as executory contracts and trusts, as may be seen in Michoud v. Girod [supra]. But the course proposed here is not so strong as to annul; the court merely refuses to aid a person violating public policy in a contract to carry it into effect when not yet fulfilled. It is mere inaction in the court, when asked to move in favor of illegality, and is not taking any forward step to annul it. "The court simply refuses" to use its extraordinary powers, and to enforce the specific performance of such a contract, but leaves the party to his remedy at law. Vigers v. Pike, 8 Clark & F. 645, 646. This is very different from refusing to enforce equities founded on an executed contract. Id. This is the exercise of a fair discretion on the facts, and must be a judicious exercise of it on the general pleadings, putting in issue, as they do, whether such performances or such facts ought to be enforced or not. All the facts are pertinent to that question, and that question is not the avoidance of the original sale, either because void and voidable, executory or executed, but relates merely as to the specific performance of a collateral agreement connected with it, illegal in character and not yet executed, and the decision on that is that the court does not feel bound to assist such a party in such a case on such facts with that particular remedy. This puts a different aspect on the case—the object of it—the effect of it—and the forms proper to accomplish it.

An executory contract is defined to be where something remains yet to be done under it, and not a contract not yet made or created. Story, Sales, § 232. That is the very

case, and this suit is for the very object of having this something executed, that is, fulfilled or done. All this appears in the evidence, and in the plaintiff's own evidence, without any special pleadings or any apparent necessity for them in order to defeat the bill. In Craig v. Missouri, 4 Pet. [29 U. S.] 426, it is held that under the general issue in assumpsit you may give want of consideration or badness of it—in short, everything which disaffirms the contract. So probably in a bill in equity in a general answer you can show and insist on everything directly impugning the propriety of affording the particular remedy or relief sought. It is laid down as an elementary principle, also, that if "the plaintiff himself alleges fraud and proves it as a part of his own case, there is no rule of law which prevents the defendant from taking all the benefit." Broom. Max. 322; 2 Inst. 713; 2 Doug. 472; 4 Scott, N. R. 165. But here, though the plaintiff fails to allege this in respect to one fact, the time when the agreement was made, yet he alleges it in all other respects, and proves it in this, and must fail for a material variance as to time, unless amending and stating the time correctly, or considering the time now to be as proved. If so considering, or if he so amend, then he both alleges and proves his own wrong. So whichever way the matter is left, the defendant must be saved on this objection. Again, it has been held in Tobey v. County of Bristol [Case No. 14.065], that a court of equity will not lend its aid to enforce specific performance, if useless or unjust. A specific performance is not a right of a party, but an appeal to the discretion of the court. Tobey v. County of Bristol [supra]. Hence on the discovery of a consideration existing, and tainted with illegality on the part of the plaintiff, whatever may be the pleadings, it is competent for the court in its discretion not to assist to compel a specific performance of the contract, or the defendant's trust.

It may be useful to illustrate this subject a little further as to what is sufficient illegality to vitiate the plaintiff's application. Fraud is, of course, enough, or anything clearly void, but less than this suffices in case of an executory contract. Illegality of almost any kind is enough. Indeed, we have before shown that being against policy is enough to avoid even an executed contract. How much more, then, should it, on principle, prevent the fulfillment of one yet executory. Here it has been held, as to a contract, that if against the policy of a law, or against public policy, courts will not enforce it, though it be not against morality. 5 Halst. [10 N. J. Law] 89; 2 South. [5 N. J. Law] 756, 763; 3 Halst. [8 N. J. Law] 54. "Considerations against the policy of the common law, or against the provisions of a statute, or against the policy of justice, or the rules and claims of decency, or the dictates of morality, are void in law and equity." 1 Fonbl. Eq. 122; 4 Yeates, 84. Where an insurance was of neutral property, though in fact belligerent, it was illegal and against public policy, and hence void, and the insured was not aided by the court to recover back the premium. Schwartz v. United States Ins. Co. [Case No. 12.505]. See other cases. And this, though ex æquo et bono, the defendant has no right to retain it (Id.), and could not sue to recover it, if not paid, Cowp. 793; 2 Bing. 250; 8 Durn. & E. [Term R.] 575; 4 Taunt. 165. See like cases. The court will not interfere to aid either, from public considerations, and hence the possession is left undisturbed, and not because his course was justifiable. In pari delicto potior est conditio possidentis. Broom. Max. 325. The only exceptions to this are believed to be those before named, where by express statute a recovery back is sometimes allowed in cases of gaming, &c., from motives, however, of greater hostility to the act, than of favor to the particeps criminis. So if to uphold a sale would be mischievous, courts will not enforce it, though it is not by any law declared to be void. Ryan & M. 386; 7 Mass. 112; 5 Barn. & C. 406; 4 Bing. 84; 2 Car. & P. 544; 12 Moore, 266; 3 Car. & P. 128; 3 Taunt. 6; 9 Vt. 23, 310; 7 Greenl. 113. Indeed, in this view of the matter, the plaintiff asking virtually a specific performance of what is against public policy and injurious to creditors, it is settled that a court of equity will not carry into effect an executory contract by decreeing a specific performance, even if it was not illegal, but was hard merely, and inequitable. King v. Hamilton, 4 Pet. [29 U. S.] 327; 1 Vt. 480. Or if there has been only negligence with the complainant. Scott v. Evans [Case No. 12.529]. Under this position the neglect to pay interest so long, or any principal is important. 2 Jac. & W. 428; Skillern v. May, 4 Cranch [8 U. S.] 140. Much less will courts aid to enforce an executory contract, if the consideration was either fraudulent or illegal, or against public policy. Scudder v. Andrews [Case No. 12.564]. This was a sale of land belonging to the United States by A. never owning it, but trying to recover the price. No man shall take advantage of his own wrong. It need not be fraud, but anything "de injuriâ suâ propriâ." Co. Litt. 148, b. By pursuing this course a court neither confirms nor annuls a voidable contract, because the parties interested in it may never choose to do it. But they say, if the contract appears to be one against public policy, the court will leave the parties to their remedies at law to enforce or annul it, and decline to use its own extraordinary modes of relief in cases of that culpable or at least equivocal character. Tobey v. County of Bristol [supra]; Le Roy v. Crowninshield [Case No. 8.269]; U. S. v. La Jeune Eugenie [Id. 15.-551]. Thus under the civil law, in case of

an executory contract, "if there was a want of complete bona fides, the jus honorarium, furnished a good defence to any attempt to enforce it at law. 1 Spence, Eq. Jur. 323; Dig. 19, 1, 11. So if a contract be immoral, though made abroad, courts here have held that they should not enforce it here. Story, Confl. Laws, §§ 244, 254, note, 257; 8 Mart. 95; Wetherell v. Jones, 3 Barn. & Adol. 221. This is not avoiding a sale or contract executed, but merely as to one still executory, and asked to be fulfilled, saying in reply we do not feel bound to enforce contracts "which offend public morals or violate the public faith." Le Roy v. Crowninshield [supra]. Ex turpi causâ non oritur actio. Broom, Max. 350–352; Holman v. Johnson, Cowp. 341

The objection to enforcing an executory contract may be much slighter than what is required to avoid an executed one. It may not be a fraud, or malum in se, or malum prohibitum, but if illegal or against public policy, it is the duty of the court to halt in the exercise of its extraordinary powers to enforce a specific performance. U. S. v. La Jeune Eugenie [supra]; The St. Jago de Cuba, 9 Wheat. [22 U. S.] 409; Doug. 250; Armstrong v. Toler, 11 Wheat. [24 U. S.] 258; Story, Confl. Laws, § 245; 1 Maule & S. 751; Toler v. Armstrong [Case No. 14,078]; Mather's Case, 3 Ves. 373; 15 Pet. [40 U. S.] Append.; 3 Story, Const. p. 245, § 1374; Smith v. Barstow [2 Dougl. (Mich.) 155]. Where the contract "is expressly or by implication forbidden by the statute or common law, no court will lend its assistance to give it effect." Pennington v. Townsend, 7 Wend. 276; Sharp v. Teese, 4 Halst. [9 N. J. Law] 352; 11 East. 502; 3 Barn. & Adol. 221; Forster v. Taylor, 5 Barn. & Adol. 887; 2 Cowp. 790. Thus a court will not enforce a contract selling the command of an India ship (8 Durn. & E. [Term R.] 89). They will not enforce it, though the parties may not have meant to violate the law, but mistook it. Craig v. United States Ins. Co. [Case No. 3,340]. So the agreement, though not immoral, will not be enforced if made in fraud of an act of congress (Hannway v. Eve, 3 Cranch [7 U. S.] 242, and Armstrong v. Toler, 11 Wheat. [24 U. S.] 258), or if growing out of an illegal or immoral act. "A court of equity cannot decree a specific execution of a contract made in violation of law or against the policy of the law." Longworth v. Taylor [Case No. 8,491]. When a trust or agreement is desired to be enforced in chancery, under its extraordinary powers over trusts and specific performances, it is a settled principle that it is to be done only in favor of those who have themselves acted legally, if not equitably, in respect to the subject. The complainant must come into court as a wronged and innocent party, not alleging his own turpitude, nor even showing it mingled with the grounds for a recovery. Bolt v. Rogers, 3 Paige, 154; 4 Paige, 229, 248; 1 Esp. 153; 3 Esp. 253;

1 Maule & S. 594; Com. Dig. "Chancery" (3 F 4); 1 Vern. 53; 2 Vern. 602. The party stands ill in court. Allegans suam turpitudinem non est audiendus. Gould v. Gould [Case No. 5,637]. "The law will not sanction dishonest views and practices by enabling an individual to acquire through the medium of his deception any right or interest." Broom, Max. p. 320. In Creath's Adm'r v. Sims, 5 How. [46 U. S.] 192, it is said that one coming into court to ask relief by an injunction against a judgment, must not only come with clean hands, but must first offer to do equity in respect to the subject matter. Indeed, it is a settled rule that whoever asks equity must first do or offer to do equity. 1 Spence, Eq. Jur. 422; 2 Swanst. 156. Once chancery required moral duties first to be performed as to the subject matter, e. g. to recall slanderous words, &c., &c. But now the plaintiff must, at least, not stand as acting illegally, and ask aid to enforce illegality. 1 Spence, Eq. Jur. 423, note. It is laid down as an elementary principle, that "a party to the fraud shall not be relieved." See last cases cited. So the complainant must be diligent himself, as well as pure. Longworth v. Taylor [Case No. 8,490]. One delinquent cannot maintain an action against another. Booth v. Hodgson, 6 Durn. & E. [Term R.] 409; Warburton v. Aken [Case No. 17,143]; 3 East. 222. Nor will the trustee even be assisted in carrying such a sale into effect. Davoue v. Fanning, 2 Johns. Ch. 267; Munro v. Allaire, 2 Caines, Cas. 183. Courts will in some cases refuse to set aside a sale which has been confirmed by a trustee, but will never assist to effectuate a purchase (of this kind,) either by having the thing purchased decreed to him specifically, or by having the means decreed to him whereby he may recover at law. Id. 194. Again, "a court of equity ought never to aid a party to have the bargain enforced or perfected, with intent, that any profit or advantage should be taken by it." Munro v. Allaire, 2 Caines, Cas. 193. A further illustration of this distinction is, that where usurious interest had not been paid, a court of equity would not aid to get it, but if already paid it would not order it paid back. Nor will the court compel a performance of a contract which works a breach of trust. That is very nearly the present case. Roberts v. Tunstall, 4 Hare, 257. The executrix, if refusing to give the deed in this case, could not have been compelled in equity to give it, because it would have been a breach of trust. Wood v. Richardson, 4 Beav. 176; 5 Madd. 438; Thompson v. Blackstone, 6 Beav. 472. Then how could she compel the purchaser to carry it into effect, so far as regards the collateral agreement, and to fulfill that which was illegal to be done? A case is in point that she could not in 6 Beav. 472. But if an illegal contract be once carried into effect, that is, after made or created, if it be executed, a court, as before explained, may require more form and notice

and particularity in the proceedings to avoid what has been executed and what is not void, but merely voidable. Fieri non debuit, sed factum valuit. 5 Coke, 38; 9 Mees. & W. 636.

Much of the argument and many of the cases connected with this point of the impropriety of aiding to enforce any illegal contract, relate to what in this sense I consider executed rather than executory agreements, and to the avoiding or rescinding of them; rather than to the enforcement of what is yet executory. The distinction, however, is strong in principle between these and runs through all the books. See cases before and others in Broom, Max. 325. Considering this trust or agreement as yet executory, I can, therefore, come to no other conclusion on the whole evidence and nature of the transaction, than that the cases and principles all harmonize against the policy of sustaining this bill.

The complainant comes into this court to enforce a trust or agreement which has no consideration whatever, except an act forbidden by law, hostile to sound policy, and voidable when executed, not only in equity, but now in most of the courts of law in the United States. It is illegal, then, and against public policy, and not to be aided in our discretion to enforce specific performances, though if it had been fulfilled or executed, it might not be annulled, except by creditors and heirs. But it is still, in and of itself, illegal; one not to be aided, assisted, or encouraged before it is done. A trust, or agreement, to be valid and to be enforced, must rest on a like foundation, and must have a good consideration. 2 Story, Eq. Jur. §§ 787, 793, 973; 2 Hawks, 302; 6 Paige, 288; 1 Ves., Jr., 55; 3 Atk. 399; 18 Ves. 149; Com. Dig. "Chancery" (2 C, 8); Winthrop v. Lane, 3 Desaus. Eq. 341. It is otherwise a nudum pactum. And ex nudo pacto non oritur actio. Broom, Max. 336. This doctrine applies to a common trust, as well as a contract, because almost every contract is in one view but a trust to pay on one side, and to convey on the other. Lewin, Trusts, 76. Without a good consideration the contract or trust resting on it is voluntary, which the volunteer may carry into effect or not at his pleasure, and which chancery will not lend assistance to enforce. Minturn v. Seymour, 4 Johns. Ch. 497; Fraser v. M'Pherson, 3 Desaus. Eq. 398; Colyear v. Countess of Mulgrave, 2 Keen, 88. The doing an act forbidden by law is manifestly not a good consideration for either a trust or agreement, and for the enforcement of their specific performance. The executrix in this case had no equities or law on which to ground a trust or contract, except an unlawful act. It is not enough to say that a consideration is not necessary for an executed trust. Hill, Trustees, 53. This was an executory trust in the sense before explained. Before the trust, all she did was in her capacity of trustee for the creditors, to let the purchasers have the land at less than others

would have given, and this under a promise to reconvey to her for that reduced sum, which was in truth a fraud on the creditors to the extent of the difference, and was forbidden by law, and which she is in this bill attempting to enforce.

It is virtually conceded now, that the first consideration and the original agreement were illegal, but it is contended that there were new and good ones when the land was assigned or transferred to the respondent. But we have already shown that they were the same, except a new trustee. And it has been well said, "the same principle applies not only to contracts growing immediately out of and connected with an illegal transaction, but also to new contracts, if they are in part connected with the illegal transaction, and grow immediately out of it." Story, Confl. Laws, § 247; [Chiroc v. Reinicher] 11 Wheat. [24 U. S.] 281; 3 Barn. & Ald. 179; Toler v. Armstrong [Case No. 14,078]; 5 Barn. & Ald. 335. The money advanced to Cutter & Co. was not advanced by her, nor that paid by the respondent since. Nothing legal was done by her at any time to lay the foundation as a good consideration for either a trust or agreement. Before this trust or agreement, both the last and first, she had owned no part of the land in her own right—she had sold nothing in her own right—paid nothing—suffered nothing—done nothing to raise an equity. Chancery will not interfere, and parties will be left in such a state of things to their legal rights in the courts of law. King v. Hamilton, 4 Pet. [29 U. S.] 327. The case of voluntary settlements has been referred to as not needing a consideration to enforce them, whether regarded as trusts or agreements. But those are usually created by deeds and wills, sealed instruments, and hence imply a good consideration, and are by means of a writing by deed taken out of the statute of frauds. So love and affection is a good consideration for them, and in most cases of that kind exist. And when the contest is with the trustee, as are many of these precedents, he has already received the property, which constitutes another good consideration for him to go on and fulfill his duty, and according to the terms of the deed, and not as here against the deed and its legal operations on its face. The consideration there, too, which does exist, or is presumed, is a good one, and not as here illegal and against public policy.

I am aware of another class of cases, some of which have been cited as applicable here, where a party may be proceeded against in chancery to enforce an obligation which would have been performed by another, except for fraud interposed by the respondent. But that is not this case on the facts. Here the defendant, looking to public policy and the rights of the creditors and heirs, interposes no fraud. He tries to defeat only what is illegal. While there, he tries to defeat what is legal, and interposes fraud or falsehood to accomplish his object, and hence a court of

equity will sometimes make such a party answerable for a legacy or devise which he has defeated by falsehood. 1 P. Wms. 288; 2 Vern. 700; 3 Atk. 539; 1 Atk. 448, note; 3 Ves. 39; 1 Story, Eq. Jur. §§ 252, 254; 1 Vent. 318; 2 Ves., Sr., 627; 14 Ves. 290; 11 Ves. 638; 2 Story, Eq. Jur. § 1265; Story, Eq. Pl. § 768. So if a failure to fulfill a promise will work a fraud, it will sometimes be enforced when the promise is lawful. 1 Hov. Frauds, 274, 275, 495; Morris v. Nixon, 1 How. [42 U. S.] 115; 6 Watts & S. 97; 1 Paige, 147; Coote, Mortg. 24; 1 Madd. 418; 4 Ves. 16; 18 Ves. 475; 13 Ves. 580; 1 Ves., Sr., 123; Vin. Abr. "Contract" H., pl. 31; 1 Atk. 449; 1 Wils. 227; Newl. Cont. 111, 179, 181; Jeremy, Eq. Jur. 499; 2 Atk. 254; Beames, Eq. Pl. 183; 1 Eq. Cas. Abr. 20; 1 Dick. 44; Gres. Ev. 208. But in this case the failure to enforce this executory agreement defeats rather than works a fraud, looking to the public and to the interests of heirs and creditors, and it advances what is legal and what is sound public policy. If it defeats anything, throws obstacles in the way of anything, it is of an executory, illegal contract between parties, neither of whom can properly or conscientiously invoke any aid from a court of equity. In the case of Jenkins v. Eldredge [Case No. 7,266], in this court. there was a parol promise to give written evidence or a written declaration of a trust, and which promise there was a failure through fraud to fulfill. But there was nothing illegal or against public policy in doing what was promised, as would be the case here, but directly the reverse. Here it may be added as a distinguishing feature of the present case, that the only ground for the trust or agreement by Cutter and Cummings in favor of the plaintiff, was the illegal act by the plaintiff, in a public capacity, professing to sell the land as an executrix, and obtain the highest price practicable for the benefit of the creditors and heirs, and in reality letting others buy it at a reduced price for her individual advantage and gain. Afterwards, to be sure, after the sale and before this bill, some expenditures were made by her on the buildings and land of a durable character, and beneficial to the purchasers and their grantees But these did not lead to the trust set up, and were not its cause or foundation. And as to these, she had sold gravel enough and had rent enough to remunerate her, probably, or if not, must have her redress or relief in some other independent form. See the cases on part performances. If one enters as if donee of land and makes improvements, he will be allowed their value out of land before sold under a decree in chancery to pay debts. King's Heirs v. Thompson, 9 Pet. [34 U. S.] 204. But by Carver v. Jackson, 4 Pet. [29 U. S.] 101, it was held that one could not be remunerated for money expended on land against the wish of the owner. [Green v. Biddle] 8 Wheat. [21 U. S.] 1. I have no doubt that sympathies for a relative and widow in poverty, and with

a large family, induced Cutter to enter into this arrangement, and while the heirs were minors, and to be brought up by her, it probably looked to their benefit rather than injury, and was disadvantageous chiefly to the creditors. But we are required to refrain from proceeding further, not that our sympathies or regard for the condition of the complainant is less than for that of the respondent; they both have, in several respects, exhibited excellent traits of character towards a destitute family, but in others have attempted, in aid of them, what the law does not tolerate to the injury of creditors or heirs, often very helpless and destitute. In some things we do not respect her motives less, but the law more. And while that law requires us to leave the respondent in possession, it is quite clear that the creditors first, and next the heirs, should have the benefit of the rise in value of this property from extraneous causes, or at least its real value in 1833 beyond what it was then sold for. On the contrary, had the complainant recovered, it ought to have been for the benefit of the same class of persons. Indeed, a widow in possession of property with her children is at times presumed to be in for them, and her acts inure to their benefit, rather than her own. Atherton v. Johnson, 2 N. H. 34; 1 Johns. 163; 5 Johns. 66; 7 Johns. 157; 1 Johns. Cas. 219; 3 Wils. 516. It is certain here, that unless the heirs or creditors are allowed to have the benefit of this agreement or trust, but the widow has it in her private right, she gets it at their cost and expense or loss. She has paid for it only by their property or what she sold on their account. And though the complainant here, as before remarked, was undoubtedly influenced more by affection for her children than any hope of personal gain, still in several cases the idea of any moral fraud on either side has been fully rebutted. and yet the sale held to be improper and invalid. Commendable as may have been the motives in some respects, the act was, therefore, one of bad policy as to creditors and heirs, was dangerous and illegal as to general principle, and not to be assisted or enforced at her request, by a court of conscience, which lends its extraordinary aid only to those who are blameless in the matter in dispute. This conclusion is strengthened in its legal force by the long neglect of the plaintiff to pay even interest at all, instead of quarterly; by never having offered to pay any principal, except as parts of the land were sold, and the money received by the respondent, rather than by her; by never tendering anything till a great change in value had occurred by the rise in value of real estate (2 Story, Eq. Jur. 484), and by the general rule to let parties resort to law for redress on their contracts, rather than ask a specific performance in equity, an extraordinary power for only the clearest cases, unless appearing there without negligence or breach of duty, or without a request to aid what is against public policy. See cases ante;

King v. Hamilton, 4 Pet. [29 U. S.] 328, 329.

If there be an inadequate price, or improper conduct, equity will not enforce specific performance, but leave a party to his remedy at law. Seymour v. Delancey, 6 Johns. Ch. 222. The discretion over this is not arbitrary, but what is sound policy, reasonable secundam arbitrium boni judicis. 2 Story, Eq. Jur. § 693. It may be well to notice, also, that we came to these conclusions, not because the respondent stands here irreproachable in his title. The consideration as to Charles Tufts rested on the same basis as the former, looking to the whole essence of the case. It was the old trust and agreement, as we have before seen, transferred to him, and for like reasons and like consideration. He was in truth the mere assignee of Cutter and Cummings, with a probable knowledge and acquiescence in all that had happened. He was her relative, her confidant, and if her betrayer under an illegal undertaking, this court must leave the parties to such an undertaking to adjust it at law or among themselves without resort to law. But he holds the land by a very precarious title, if the creditors or heirs choose to interpose, unless they are barred by lapse of time. And I see no reason why the plaintiff or all parties cannot after this obtain redress at law in their own state courts after we decline to give relief by a specific performance, if she or they ever had any legal rights which have been violated.

These conclusions as to Charles Tufts, the principal respondent, render it unnecessary to decide whether in any other aspect of the case the possession by the plaintiff was not sufficient notice to the other respondent, Wheeler, so as to bind him in relation to her rights and claims. To show that it is, we have been referred to 16 Ves. 249; 2 Swanst. 281; 2 Schoales & L. 595; 2 Ball & B. 301; 5 Price, 306; 1 Mer. 252; 13 Ves. 121; 1 Colly. 203; 1 Jac. & W. 181; Flagg v. Mann [Case No. 4,847]. For some exceptions, see Leland v. The Medora [Case No. 8,237]; 5 Barn. & Ald. 145; 2 Russ. & M. 626; 1 Johns. Ch. 566; 14 Serg. & R. 333. It is in most of the states, if it be a new possession. 13 Ohio. 408, 413; 4 Blackf. 96; 4 Whart. 259; 10 Gill & J. 316; 4 Mass. 67; 2 Rand. 101; 2 Paige, 300; 3 Paige, 424; 9 Conn. 286; 3 Conn. 146; 24 Pick. 222. But several of these cases rest on a peculiar state of facts; and mere occupation in towns and villages, where so many tenements are leased, and where the registry laws govern as to titles, is a very uncertain indication or presumption of anything beyond a leasehold estate. Independent of this, public policy certainly requires that a purchase without notice should not be injured by a secret trust. 1 Spence. Eq. Jur. 445, note. And that a possession, not only new like this, but with a frequent disclaimer of title, and where Charles, also, receives possession with a deed recorded, and occasionally exercising as strong acts of owner-

ship as herself, should hardly be deemed conclusive notice as to title of real estate being probably in her, rather than him. Much has been said, also, of the validity of the sale to Cutter and Cummings, and by them to Charles Tufts. But without intending to decide absolutely any questions not necessary to be decided for the proper disposal of the case, I would add to the remarks already made on this point, that if Cutter and Cummings purchased the land under an improper arrangement with Mrs. Tufts, I see no reason why the creditors or heirs should not be allowed to avoid that sale, and if their assignee or grantee, Charles Tufts, bought with a full knowledge of that arrangement, and with a view to carry it into effect, why the sale should not be avoidable also in his hands by the heirs or creditors. That is the usual state of things and the usual controversy in cases in this category. But as before remarked, the question here is not about the deed to Cutter and Cummings, and its avoidance. It is about the enforcement of a collateral agreement, which has never yet been fulfilled or executed.

In conclusion, there is one other aspect of the difficulties in this case, which, fertile as have been the objections raised, has escaped much attention of counsel, but seems to me deserving of some weight. It is a want of power to do what has been attempted here. It is the inability of any executor, selling lands to pay debts, whether under a general clause in a will or a license, to create a trust estate for himself, or any other person, not paid for separately and additionally. His duty is to sell, to sell the whole title, and to get pay for the whole, to sell a fee if a fee exist, a freehold if a freehold exist, and be paid for them. He seems to have no authority to carve out different estates or interests, and sell some and reserve some, or give some away for nothing. Suppose it is done by deed, and not by parol, as here, it is still an apparent departure from his power or authority, though it might then escape any objection from the statute of frauds, it being then an express trust created, as well as evidenced, by writing. 1 Spence, Eq. Jur. 496. But such express trusts are defined to be those "created by the act of some party having the dominion over property, with a view to the creation of a trust." 1 Spence, Eq. Jur. 495. An executor in such case would seem to possess no such "dominion." Much less can we imply or presume he has, from his position and duty, when the policy of the law, as already shown, is hostile to such a course, and enables the persons suffering from it to avoid such sale, even after they are executed.

This is a question in the aspect of naked power, and not one of policy independent of that, and which policy may uphold such a sale if executed, and if ratified by those interested, but not without a ratification express or implied. Here, likewise, the com-

plainant herself was a trustee under the will, selling the land to pay debts (Taylor v. Savage, 1 How. [42 U. S.] 282; Lewin, Trusts, 65; 1 Spence, Eq. Jur. 508), and yet not in reality selling the whole title, but a trust estate merely, reserving rights of reconveyance to herself as an individual, and for her private benefit, which have never been paid for to the estate or accounted for, and which she had no legal authority to reserve. It is an attempt to sell property as a trustee, and for which she never paid anything in her own right in such way as to give her a private benefit at the expense of others, the cestui que trusts. It is virtually an attempt to secure a private advantage with the funds or means of others, rather than her own, and which she seems to have had no power whatever to do; and which attempt common honesty, as well as equity and law, must unite in discountenancing rather than in aiding. Nor does this reasoning rest on the idea that such a sale or agreement, after executed, may not be confirmed afterwards by creditors and heirs, if knowing it long, and not avoiding it; but until so confirmed, its validity looks on principle very questionable.

I should come to this conclusion with more reluctance, saying that these parties should be left to settle their rights at law, if it was not apparent that they both really belong to this commonwealth, live in the same town, and may yet, for aught known by me, try and settle their rights before the state tribunals, if they please to resort to them.

Let the bill be dismissed.

[An application was made by the complainant for a rehearing in this cause, which was denied. Case No. 14,232.]

### TUG.

[NOTE. Cases cited under this title will be found arranged in alphabetical order under the names of the boats; e. g. "The tug C. F. Ackerman. See C. F. Ackerman."]